# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FLOYD JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 08-566 (RMC) |
| | ) |
| GLAXOSMITHKLINE, LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Floyd Jones, an African-American man, sues GlaxoSmithKline, LLC ("GSK"), his former employer, alleging harassment and hostile work environment based on his race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and wrongful termination in breach of an implied contract.[1] On March 1, 2010, at the end of prolonged discovery, GSK filed a motion for summary judgment. After three extensions, Mr. Jones filed no opposition. Therefore, on April 23, 2010, GSK moved the Court to treat its unopposed motion for summary judgment as conceded, and the Court issued an order to show cause why said motion should not be granted. Mr. Jones responded on April 26, 2010, and stated: "If Plaintiff does not file [his opposition] on April 28, 2010, Plaintiff has no further extension or opposition to Defendant's Motion for Summary Judgment." Pl.'s Opp'n to Def.'s Mot. to Treat its Unopposed Mot. as Conceded [Dkt. # 49] ¶ 10. Nonetheless, Mr. Jones's opposition was filed on April 29, 2010, with no motion for

---

[1] *See* Third Am. Compl. [Dkt. #41] ¶ 1. Since filing the Third Amended Complaint, Mr. Jones has "concede[d] all counts except the claim of Harassment under Title VII and the claim of wrongful termination." *See* Pl.'s Opp'n to Def.'s Mot. to Treat its Unopposed Mot. as Conceded [Dkt. # 49] ¶ 6; Pl.'s Opp'n to Def.'s Mot. for Summ. J. [Dkt. # 50] 3.

leave to file late, and GSK followed with a reply on June 21, 2010. Given the history of this case, the Court could take Mr. Jones at his word and grant summary judgment as conceded or dismiss the matter for failure to prosecute. Nonetheless, given the "strong polic[y] favoring the resolution of genuine disputes on their merits," *Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980), the Court has reviewed the pleadings and decides the case on its merits. Summary judgment will be granted to GSK.

## I. FACTS

GSK hired Mr. Jones as a Pharmaceutical Consultant and he began work on approximately June 26, 1995.[2] In that role, he was principally responsible for calling on hospitals, medical centers, and healthcare professionals to engage in face-to-face discussions regarding the use and benefits of GSK's medical products. In September 2003, Mr. Floyd assumed the position of Oncology Senior Executive Account Manager, a position he held until his discharge on March 30, 2006. His basic duties continued to entail meeting with healthcare professionals to discuss and promote GSK's products.

### A. Events Leading to Mr. Jones's Discharge

GSK restructured its Oncology Division in January 2005 and Mr. Jones was assigned to the Acute Care Group. That reassignment placed him under the supervision of Joanna Turbeville, who was the Regional Sales Director. GSK measures the performance of its sales representatives, in part, based upon their sales rankings, which GSK prepares on a quarterly basis. In the last quarter of 2004, Mr. Jones was ranked in the top 15% in the nation among GSK's salesforce. Starting in

---

[2] The facts which bear no citation are from the Defendant's Statement of Material Facts that Mr. Jones does not contest. *See* Def.'s Facts [Dkt. # 44]; *see also* Opp'n 5–10.

January 2005, his sales rankings began to decline and, over the course of the next four quarters, plummeted from the top 17%, top 52%, top 71%, top 82%, until the first quarter of 2006, when Mr. Jones tied for last in the nation. As Mr. Jones notes, the precipitous drop in his sales performance coincided with Ms. Turbeville's assignment as his supervisor. *See* Opp'n [Dkt. # 50] 6 ¶ 18.

As his supervisor, Ms. Turbeville spent time in the field with Mr. Jones to observe his work performance on five occasions: in March 2005, June 2005, November 2005, January 2006, and March 2006. These "work contacts" are intended to give GSK supervisors an opportunity to observe sales representatives as they call on health care professionals, after which the supervisor provides feedback on the representative's performance. The substance and feedback from these work contacts were captured in written notes called "Field Coaching Tools," which Ms. Turbeville prepared and then shared with Mr. Jones. In the first of these Field Coaching Tools, which followed the March 2005 work contact, Ms. Turbeville noted that "Floyd has the desire and skills to move this product," and that her expectation was that "Floyd will move a lot of business." Def.'s Mem. in Supp. of Mot. for Summ. J. [Dkt. # 44] ("Def.'s Mem."), [Ex. 2] Decl. of Joanna Turbeville ("Turbeville Decl."), [Ex. A] Field Coaching Tool 3/23 & 3/24. Ms. Turbeville suggested: "Look at your geography from an account basis and identify where your efforts will get the maximum ROI [return on investment]. Find ways to see the orthos [orthopaedic doctors] that are driving your business." *Id.* Further, she suggested that he "[f]ocus cslls [sic] mostly on selling the product versus sharing information." *Id.* Despite these generally positive comments, Mr. Jones thought that Ms. Turbeville was "very contentious" during this work contact and that she "challenge[d] me without any resolutions to help me improve the situation." Def.'s Mem., [Ex. 1] Decl. of Mary Kate Harkins, [Ex. D] Floyd Jones GSK Employee Issues File ("Jones GSK Employee Issues File") 1 (quoting

Week of 3/21/05 entry).

When Ms. Turbeville next worked with Mr. Jones in June 2005, she expressed concerns about his "market knowledge" and strategic analysis and planning. Turbeville Decl. ¶ 9; *see also id*., [Ex. B] Field Coaching Tool (undated). Specifically, Ms. Turbeville observed that Mr. Jones did not seem to have his routing — a schedule of doctors to call on — well developed. *Id*., [Ex. B] Field Coaching Tool (undated) ( "Floyd need[s] to get the routing done and spend more time selling and less time tracking down the doctor."). She was concerned that Mr. Jones spent so much time finding doctors that it limited the amount of time he could spend actually selling the product. *See* Turbeville Decl. ¶ 9. She found that he was "[g]ood at sharing the information, [but] need[ed] to include the visual and clinical. Go over the clinical as you show it. You know the data but need to sell it with a sense of urgency." *Id*., [Ex. B] Field Coaching Tool (undated). Mr. Jones was also approximately rated "fair" in the four of five "Winning Practices" ranking categories in which he was rated. Mr. Jones was not rated in the category Teamwork & Leadership. Ms. Turbeville noted that she was "[s]till determining this." *Id*. In response, Mr. Jones wrote:

> I have been dis-empowered and discouraged by the clash of personalities that have existed on this team over the past several months.[3] The routing of physicians requires me to spend a good portion of my time providing information to the nurses and the Doctor in the hospital, and I have good access in some areas and adequate access in others. Also, I have attempted to exert my influence to correct and improve the working relationship with my teammates, which will improve the contact with customers. . . .

*Id*. at 2.

_____

[3] It is clear that Mr. Jones was having a very difficult relationship with at least one other GSK employee: Susan Vasco, another sales representative. *See infra* Part I.B.

The November 2005 work contact between Ms. Turbeville and Mr. Jones noted some continuing problems and some improvements:

> Floyd has identified who can write Arixtra today. He has selected a hand full [sic] of Orthos to focus activity and frequency for the remainder of the year. He has improved at getting time with the doctors, but I have not seen a lot of selling in front of the customer. For example, the Ortho group we saw was detailed on Medicare Part D and the new educational device, but there was no use of visual and no mention of efficacy with our core messages delivered. I expect this to be the core of every interaction.

Turbeville Decl., [Ex. C] Field Coaching Tool (undated). Ms. Turbeville advised Mr. Jones that she expected him to use his "visual and clinicals as a seasoned account manager and [to be] asking for the business." *Id.* She noted that "[w]e discussed this on the contact in March and on the June contact." *Id.* Ms. Turbeville also indicated that Mr. Jones was not selling the product to the extent he could, and that his last quarter did not meet expectations and that the current quarter was trending the same way. *Id.*

When Ms. Turbeville and Mr. Jones met at the next work contact in January 2006, they had a lengthy discussion concerning his career. Mr. Jones expressed his interest in management positions and Ms. Turbeville wrote that she "could not support him for further positions at this point. His focus needs to be on meeting expectations as a surgical account manager" and on "leadership and strategic planning skills." Turbeville Decl., [Ex. D] Field Coaching Tool 1/18 & 1/19/06. Ms. Turbeville noted that Mr. Jones's main strategy was to "do a lunch once a month with the key office he targeted," but that he needed to develop a more strategic approach and a plan to move business. *Id.* She also noted that Mr. Jones had some improved coordination, but she expressed disappointment that his numbers had not risen in one particular region. *Id.* She acknowledged his

past success: "Floyd, you have had tremendous success in the past. Draw on what worked then and utilize these skills to get on top in this position." *Id.* Lastly, Ms. Turbeville informed Mr. Jones that "[w]e will discuss your career growth on each contact, but now is the time to meet expectations in your current role." *Id.*

The March 13, 2006 work contact was especially problematic. Ms. Turbeville noted that she and Mr. Jones were "[n]ot successful in meeting call objectives for today." Turbeville Decl., [Ex. E] Field Coaching Tool 3/13/2006 at 2. Ms. Turbeville commented:

> Floyd took me to see Dr. Oplinger in Rockville. We drove around for a while and Floyd stated, "this doesn't look familiar like last itme" [sic]. We ended up in a housing community. I asked Floyd where he saw Dr. Oplinger last time, and he said it was at another office building. I said to call Dr. Oplingers [sic] office after he decided to go to the hospital and track him down. Floyd, this is another example of poor strategic planning. You should have called yesterday to find this MD. I called the hospital for Floyd, and they had no record of Dr. Oplinger. I asked Floyd to go to the office where he saw this MD last time, and he said he had just ran into him in the lobby and saw his name on his MD coat. (white coat) [sic]. He stated that he stopped and talked to him, and that now he was going to follow up. We went to the building that Floyd said he ran into this doctor, and his name was not on the marquis. Floyd shrugged his shoulders and I suggested we go into a surgery office suite and ask if they knew this doctor, [n]o one had heard of Dr. Oplonger [sic] at this office. I asked Floyd why he didn't ask Dr. [O]plinger where and how he could follow up with him on Arixtra, and he said that was his mistake. I discussed with Floyd that this is not the type of behavior and strategy I would expect from someone of his tenure and a specialty representative. This is the type of strategy I would expect from a brand new hire to GSK. We never located Dr. Oplinger and went to see another office. I discussed my frustration with continued lack of strategy with Floyd. We reviewed frequency on the top doctors and Floyd is still not seeing the doctors on the frequency that we had discussed previously. I asked for his routing, and he showed me an old one. Floyd agreed that he needed to update his routing.

*Id.* Ms. Turbeville found that Mr. Jones's lack of a strong strategic plan was "unacceptable after 18

months selling Arixtra." *Id*. at 1. Ms. Turbeville again focused on what she concluded was Mr. Jones's lack of strategic thinking and planning, outdated routing, and insufficient frequency in visits. She wrote that she "was concerned with what [Mr. Jones] was doing with this time and how he was managing it." *Id*. She specifically stated that she was going to review Mr. Jones's "call reporting to look at frequency on the doc[tors] he identified form [sic] his routing" and that she would follow up with Mr. Jones on the results. *Id*.

> Ms. Turbeville also conveyed a direct written message to Mr. Jones:
>
> I want to review time management with you after I review [internal company reports] and calendar to ensure you are focusing on the business and using good strategy. Strategic planning and account management skills are a vital part of this job, and you have not demonstrated these skills in running your business. As discussed, my expectations were much higher based on your tenure and previous success, but your activities are mirror [sic] that of a new representative.

*Id*. She concluded, "Floyd is not meeting expectations of performance based on goal attainment and skill sets that are needed to be successful as an account manager." *Id*.

Unhappy with Mr. Jones's performance at the March 13, 2006 work contact, Ms. Turbeville examined GSK records to determine how Mr. Jones was using his time. GSK sales representatives' primary responsibility is to conduct face-to-face discussions with health care professionals about the use and benefits of GSK products; such meetings are referred to as "calls." Ms. Turbeville reviewed Mr. Jones's records of calls from early March 2006 and identified two instances of what she considered suspicious call reporting. First, Mr. Jones reported a call on March 2, 2006, with Dr. Oplinger in Frederick, Maryland, where he reported he had discussed GSK products. However, when Ms. Turbeville located and called Dr. Oplinger, she was told he had not

been in Frederick at any time in 2006 and that his office is actually in Pennsylvania. Turbeville Decl. ¶ 16. Mr. Jones later explained that he met a physician at a medical office building in Frederick whom he believed to be Dr. Oplinger, and recorded that meeting as a "call." Opp'n, [Ex. A] Aff. of Floyd Jones ("Jones Aff.") ¶ 18.

The second questionable report concerned a Dr. Hamersley, with whom Mr. Jones recorded a call on March 13, 2006. However, that was the date on which Ms. Turbeville accompanied Mr. Jones on their last work contact. She knew that they had stopped by Dr. Hamersley's office but that the doctor was very busy and Mr. Jones did not have a face-to-face meeting with the doctor about GSK products. While no face-to-face discussion occurred, Mr. Jones left literature at the office. *See* Jones Aff. ¶ 17; Def.'s Facts [Dkt. # 44] ¶ 67. When Ms. Turbeville asked Mr. Jones why he recorded this visit as a "call," he explained that he would report a call if he left product information or made an appointment, not just when he had a face-to-face meeting with a physician. Ms. Turbeville told Mr. Jones that he knew leaving literature did not constitute a call; GSK policy requires a face-to-face discussion with a health care provider about GSK products to constitute a recordable "call."

Ms. Turbeville's review of Mr. Jones's reported "calls" caused her to review Mr. Jones's expense reports, which included a request for reimbursement that Mr. Jones had submitted for lunch with Dr. Davidson, an orthopedic surgeon, at a Ruby Tuesday restaurant in Alexandria, Virginia, on February 16, 2006. Ms. Turbeville had already approved payment of the expense. However, when she compared the lunch receipt with Mr. Jones's call report for February 16, 2006, she noted that there was no call listed that day for Dr. Davidson. Ms. Turbeville called Dr. Davidson's office and learned that he had not gone to lunch with Mr. Jones on February 16, 2006,

and that he had never gone to a Ruby Tuesday restaurant with Mr. Jones at any time. Turbeville Decl. ¶ 21. In response to her questions, Mr. Jones explained that he purchased two carry-out lunches, that he left both at Dr. Davidson's office for the doctor, and that he never reported that the lunch was a sit-down lunch. *See* Jones Aff. ¶ 24; Opp'n, [Ex. 4] Floyd Jones Deposition Excerpt (6/3/2009) 113–16. Ms. Turbeville observed that the restaurant receipt showed that two people ate lunch in the restaurant from approximately 12:13 pm to at least 12:59 pm, suggesting that Mr. Jones's explanation was not accurate. Turbeville Decl. ¶ 23; *see also id*., [Ex. H] 2/16/2006 Ruby Tuesday Receipt.

Ms. Turbeville became convinced that Mr. Jones had falsely reported "calls" he had not made and had submitted a false reimbursement request. Turbeville Decl. ¶¶ 18, 22. She discussed these conclusions with Mary Kaye Harkins, GSK's Director of Human Resources ("HR"), and a decision was made to terminate Mr. Jones. A separation notice dated March 30, 2006, was prepared by HR, stating:

> This memo is to inform you that it has been determined that you have violated GlaxoSmithKline's Employee Conduct policy; Misrepresentation, including falsification of reports or records, or deliberate failure to accurately complete reports or records; and as a result are being separated from employment effective March 30, 2006.
>
> You reported on March 2, 2006 that you talked personally with Dr. Oplinger. Dr. Oplinger stated that he had not been in Fredrick [sic], MD at any time this year yet you recorded him as a call in your records. Dr. Oplinger's office is located in Pennsylvania.
>
> On March 13, 2006 we visited Dr. Hamersley's office. You made an appointment to bring in lunch and we left. We never saw the doctor, and no information was left behind yet you report Dr. Hamersley as a call in your records and entered call notes.
>
> On your 2/05 to 2/18/06 expenses you reported a lunch with Dr. Stuart

> Davidson at Ruby Tuesdays in Alexandria, VA. Dr. Stuart Davidson stated
> that he has never been to Ruby Tuesdays with you. The schedule A states
> that the meeting took place at Ruby Tuesday.

Turbeville Decl., [Ex. I] 3/30/2006 Separation Notice. The separation notice was given to Mr. Jones

on March 30, 2006, during a meeting with Mr. Jones, Ms. Turbeville, and Ms. Harkins.

Mr. Jones acknowledges that, at a minimum, he mis-recorded a meeting with Dr.

Oplinger on March 2, 2006, when the meeting was really with another doctor whose identity Mr.

Jones cannot remember. Def.'s Mem., [Ex. 4] Aff. of Warren E. Buliox, [Ex. E] Dep. of Floyd Jones

6/3/2009 ("Jones Dep.") 151–52. He also admits that he did not have a face-to-face meeting with

Dr. Hamersley as reflected on one of his call reports. Jones Dep. 158–159 ("I did make contact with

Dr. Hamersley on that day when we were in the office. I didn't get to see her, but we kept in

communication by phone or email. . . . I did have an e-mail contact, *I believe*, with Dr. Hamersley

on that date, but we didn't physically see her when we were in the office.") (emphasis added). Mr.

Jones also acknowledges that he did not eat lunch with Dr. Davidson at Ruby Tuesday, as reflected

in his February 5–18, 2006 expense report. Third. Am. Compl. ¶ 53 ("Jones mistakenly wrote that

he had lunch at Ruby Tuesday's Restaurant, rather than take-out which he brought to Doctor

Davidson."); *see also* Jones Aff. ¶ 24. Mr. Jones argues these actions did not constitute falsification

of records. *See* Third Am. Compl. ¶ 78 ("Plaintiff never falsified records as alleged in Defendant's

termination letter."); ¶ 80 ("Plaintiff was wrongfully terminated as he did not falsify records and he

was not afforded an opportunity to grieve the allegations.").

## B. Allegations of Harassment

All the while, Mr. Jones was offended by Ms. Turbeville's treatment of him during

the time she was his supervisor. Mr. Jones called Human Resources and spoke with its Director, Ms.

Harkins, on March 17, 2006, relating to concerns he had with his treatment by Ms. Turbeville.[4] He told Ms. Harkins that he thought Ms. Turbeville's "behavior was demeaning and degrading to [him] and that she had said some things that [he] thought were inappropriate." Jones Dep. 323–24. Mr. Jones does not remember whether he told Ms. Harkins that he felt he was being harassed because of his race or sex. *Id*. at 324.

Mr. Jones again expressed concerns about his working conditions when he met with Ms. Harkins and Ms. Turbeville on March 30, 2006, at the meeting where he was terminated. He gave a typed list of grievances titled "GSK Employee Issues File" to Ms. Harkins. This document noted dissatisfying events in Mr. Jones's work environment from February 2005 to March 2006. As relevant to Mr. Jones's remaining claims, the issues raised in the list were:

- Week of 2/07/05: Received a call from Susan Vasco accusing me of trying to preempt her business relationships with several customers. She rants and raves at me for more than 20 minutes on the phone, and she calls me several names. Also, she is very unprofessional to me, and she tells me that she had to clean up all of my missteps with these same customers. The conversation creates a very hostile environment for me, . . . .
- Week of 3/21/05: Work Contact with JoJo Turbeville. Briefly mention the issue and challenges of working with Acute Care counterparts, and she shrugs it off as something that we are going to have to work out. . . . She is very contentious on our Work Contact, and she challenges me without any resolutions to help me improve the situation.
- Week of 4/11/05: I make an attempt to discuss several accounts with Susan Vasco, and she becomes belligerent and

---

[4] Mr. Jones's recollection of the March 17, 2005 conversation with Ms. Harkins is: "I spoke to Mary Kate Harkins to relay this whole situation, so that I could gain a better understanding of my rights as an employee. Also, I expressed that I felt threatened by JoJo Turbeville, and I express[ed] to her that I have never worked for a manager that I could not talk to about any issue. Also, I discussed that my career was not progressing as I expected, and I have some real concerns." Jones GSK Employee Issues File 3.

- unkind to me. Also, she yells at me and begins to call me names over the phone. I make several attempts to have her address the name calling, so that she can explain her unprofessional behavior.

- May of 2005 (approximately second week): Meet with JoJo Turbeville and Susan Vasco . . . to discuss the unprofessional behavior directed towards me. . . . It appears that I was suppose[d] to be able to do something more to resolve this situation prior to our meeting date.[5]

- June of 2005: . . . Also, I have the opportunity to speak to JoJo [Turbeville] in a one-on-one setting, and I want to express my feelings of stress to her because of her style of managing me. I mention that we should be having more fun as a business unit, so that we can have a more positive outlook. She immediately squashes my suggestion, and she said, "You are out here to generate sales, and the expectations are you will work towards that . . . ." This was not a good sign for me, because she dismissed any feelings or ideas that I contribute without hearing them.

- Week of 8/22/05: We present a business plan to Jo Jo Turbeville . . . . However, the plans that I developed are dismissed, and I am given instructions to increase sales. . . . The session was intense, and it provided an opportunity to discuss areas of growth. Also, I am suppose[d] to develop a list of 20 physicians to focus on for the fourth quarter, and live in their offices as quoted to me.

- Week of 11/07/05: Work Contact is productive, and we get to see some key Orthopaedic physicians within my territory. We are given direction to develop a plan for Mary Washington Hospital, which is suppose[d] to be generating a great deal more business than it is currently.

- Week of 1/16/06: . . . The two days are somewhat productive, and they could have had more impact. The communication with JoJo Turbeville is improving to some degree.

- Week of 3/13/06: The day gets off to a very slow start, because JoJo Turbeville is staying in downtown, and we have to travel to Frederick, MD, which is about one hour away. We are going to see a physician that I had just called on a

---

[5] On June 15, 2005, Ms. Turbeville recognized that Ms. Vasco's treatment of fellow employees warranted correction and she issued a "Coaching Memo" to her. Turbeville Decl., [Ex. J] Letter to Susan Vasco. The Third Amended Complaint does not specifically complain of Ms. Vasco's behavior.

couple weeks prior. The search for his office starts out slow, because I met him in one building and his office is listed in another area of town. We have great difficulty locating the physician, and I discover a couple of days later that he was not the same physician that I thought was in my computer. I made a tremendous mistake in identifying and logging this physician's information. After I decide to head to another part of the territory, the incident is described as bizarre and crazy by JoJo Turbeville. Also, she proceeds to demean and degrade me while we are traveling to Rockville, MD, and she does not let up as we try to see Dr. Sheri Hamersley. Also, she continues this demeanor as we are standing in the Orthopaedic offices of Dr. Stinson and Dr. Debaklay, . . . We proceed to lunch, where she continues to berate me in front of patrons at the restaurant, and we have several on-lookers as I attempted to defend my actions.

- March 17, 2006: I visit two offices that I had recently conducted lunches, and the staff is chiding me that I am in trouble with my Manager because she called to verify my previous appointment. . . . I called JoJo Turbeville to verify this action, and she confirmed it and I told her that I respected her position.

Jones GSK Employee Issues File 1–3. In his Opposition, Mr. Jones identifies additional incidents with Ms. Turbeville that he contends demonstrate illegal harassment under Title VII:

- In "ride-alongs" with Ms. Turbeville (of which there were five (5) in total . . .), Ms. Turbeville would frequently tell him what her political party affiliation was so as to intimidate him.
- Ms. Turbeville on one occasion told him that she voted for a democrat [sic] in a gubernatorial race as if (as Plaintiff puts it) to suggest that she was doing him, Plaintiff, a favor.
- Ms. Turbeville indicated to Plaintiff that she would whip him into shape despite the fact that Plaintiff believed he was working at a level where he did not need to be "whipped into shape."
- On occasion, Ms. Turbeville would tell Plaintiff that she did not know him well enough to recommend him for job opportunities.
- Ms. Turbeville expressed dissatisfaction with Plaintiff working on his master's degree while working for Defendant and insisted that he focus more on his customers.

-13-

- Ms. Turbeville would contrast herself with Plaintiff by saying that she had what it takes to get ahead and that Plaintiff did not.
- Ms. Turbeville did not like the fact that he [had] won awards in the past and believed that they were somehow given to him as opposed to him earning them.
- In a restaurant prior to him being discharged, Ms. Turbeville sat for an hour demeaning him and eventually calling him bizarre (this was a reference to the March 13, 2006, work contact where they searched for Dr. Oplinger).

Opp'n 12–13; Jones Dep. at 312-320. Mr. Jones argues that these incidents demonstrate that he was frequently harassed by Ms. Turbeville and that "some of her conduct was offensive and some was targeted to discipline and ultimately remove Jones for reasons that no[] specific rule forbids or for an action that Turbeville permitted another employee to correct."[6] Opp'n 14.

### C. Procedural History

Mr. Jones initiated suit in the Superior Court of the District of Columbia on March 6, 2008. It was timely removed to this Court on April 1, 2008, based on diversity jurisdiction. *See* Notice of Removal [Dkt #1]. The original Complaint alleged disparate treatment, disparate impact and hostile work environment based on Mr. Jones's race in violation of the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq*. *Id*., [Ex. A] Compl. GSK filed a prompt motion to dismiss because Mr. Jones had litigated his claims under the D.C. Human Rights Act to conclusion before the D.C. Office of Human Rights and could not seek to re-litigate them in court, D.C. Code § 2-1403.16a, and because the claims were barred by the statute of limitations, D.C. Code § 2-1403.16(a). *See* Def.'s Mot. to Dismiss [Dkt # 3]. In response, Mr. Jones filed a motion to remand to Superior Court. *See*

---

[6] The claim that Mr. Jones was targeted for an action that Ms. Turbeville allowed another employee to correct refers to Sharon Goodwyn-Pines, who is said to have mis-reported a call but was allowed by Ms. Turbeville to correct it. Opp'n 7 ¶ 54; *see* note 14 and accompanying text.

Pl.'s Mot. to Remand [Dkt # 8]. The Court denied the motion to remand by Minute Order on October 3, 2008, *see* Minute Entry Order 10/3/2008, and Mr. Jones filed a First Amended Complaint on October 20, 2008. *See* First Am. Compl. [Dkt. # 18]. While the First Amended Complaint stated that it was brought under Title VII, 42 U.S.C. 2000e *et seq.*, and the D.C. Human Rights Act, its claims were asserted only with reference to D.C. law and were basically identical.[7] GSK re-filed its motion to dismiss. *See* Def.'s Mot. to Dismiss [Dkt # 19]. In response, Mr. Jones filed a motion for leave to file a second amended complaint. *See* Def.'s Mot. to File Second Am. Compl. [Dkt # 24]. The Second Amended Complaint was filed on January 6, 2009, *see* Second Am. Compl. [Dkt. # 27], and was answered on January 21, 2009. *See* Answer [Dkt. # 28].

The Second Amended Complaint was brought under Title VII and the D.C. Human Rights Act. It advanced claims of 1) disparate treatment and 2) harassment and hostile work environment based on race *and* sex, in violation of both laws. The parties proceeded to discovery. At the end of discovery, Mr. Jones filed a motion for leave to file a Third Amended Complaint, which GSK opposed. In the Third Amended Complaint, Mr. Jones sought to add a disparate impact and wrongful termination claim. Leave was granted in part and the Third Amended Complaint was filed on September 9, 2009. *See* Third Am. Compl. [Dkt. # 41]. The Third Amended Complaint alleged disparate treatment, harassment and hostile work environment, and termination based on race and sex, in violation of Title VII and the D.C. Human Rights Act, and wrongful termination in breach of an implied contract of due process. *See id.* A period of 60 days was allowed for further discovery concerning the alleged wrongful termination claim. *See* Order [Dkt. # 40].

---

[7] The Equal Employment Opportunity Commission issued a right-to-sue letter to Mr. Jones on September 12, 2008.

GSK filed a motion for summary judgment on March 1, 2010. *See* Def.'s Mot. for Summ. J. [Dkt # 44]. In a consent motion, Mr. Jones sought, and was granted, an extension of time to file his opposition until April 1, 2010. *See* Pl.'s Mot. for Extension of Time [Dkt # 45]; Minute Entry Order 3/22/2010. Mr. Jones filed a second consent motion for an extension of time to file his opposition by April 5, 2010, which was granted. *See* Pl.'s Mot. for Extension [Dkt # 46]; Minute Entry Order 4/1/2010. The Court held a telephone conference with the parties on April 9, 2010, at which time the Court further extended the deadline for Mr. Jones's opposition until April 16, 2010. *See* Minute Entry Order 4/9/10. When Mr. Jones failed to file his opposition by the new deadline, despite three extensions, GSK moved, on April 23, 2010, for an order treating its unopposed motion for summary judgment as conceded. *See* Def.'s Mot. to Treat its Unopposed Mot. as Conceded [Dkt. # 47].

The Court then issued an order for Mr. Jones to show cause why the Defendant's motion for summary judgment should not be granted as unopposed. *See* Order to Show Cause [Dkt. # 48]. In response, Mr. Jones filed a notice whereby he committed to file his opposition by April 28, 2010. *See* Pl.'s Opp'n to Def.'s Mot. to Treat its Unopposed Mot. as Conceded [Dkt. # 49]. Mr. Jones also "concede[d] all counts except the claim of Harassment under Title VII and the claim of wrongful termination." *Id.* ¶ 6. Mr. Jones filed an opposition on April 29, 2010, *see* Opp'n [Dkt. # 50], despite his statement that "[i]f Plaintiff does not file [his opposition] on April 28, 2010, Plaintiff has no further extension or opposition to Defendant's Motion for Summary Judgment." Opp'n to Def.'s Mot. to Treat its Unopposed Mot. as Conceded ¶ 10. Defendant filed a reply on June 21, 2010. *See* Def.'s Reply in Support of Mot. for Summ. J. [Dkt. # 53].

At this point, Mr. Jones charges GSK with harassment/hostile work environment

because of his race and/or sex, in violation of Title VII, and wrongful discharge from breach of an implied contract of due process, *i.e.*, an investigation before a termination decision and an opportunity to grieve thereafter.[8]  The case is now ripe for decision.

## II.  LEGAL STANDARD

### A.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a

---

[8]  The Third Amended Complaint alleges that GSK had personnel policies that required an investigative process into alleged misconduct prior to termination, and a grievance procedure for alleged violations of GSK's policies, which "create[d] an implied contract of due process prior to the termination of employment." Third Am. Compl. ¶¶ 73–75.

reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## B. Title VII

Title VII prohibits an employer from discriminating on the basis of race, color, religion, sex, or national origin in hiring decisions, in compensation, terms, and conditions of employment, and in classifying employees in a way that would adversely affect their status as employees. 42 U.S.C. § 2000e-16. The Supreme Court has determined that the language of Title VII "'is not limited to 'economic' or 'tangible' discrimination. The phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)) (internal quotation marks omitted). Therefore, Title VII is violated when a plaintiff demonstrates that the "workplace is permeated with discriminatory intimidation, ridicule, and insult" and that this behavior is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotation marks omitted). To establish a prima facie hostile work environment claim, a plaintiff must demonstrate (1) that he is a member of a protected class, (2) that he was subjected to unwelcome harassment, (3) that the harassment occurred because of his membership in a protected class, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment, and failed to act to prevent it. *See Lester v. Natsios*, 290 F. Supp. 2d 11, 22

(D.D.C. 2003).

"The key terms, then, are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work environment." *Id.* In determining whether a hostile work environment claim is substantiated, a court must look at all the circumstances of the plaintiff's employment, specifically focusing on such factors as the frequency of the discriminatory conduct, its severity, whether it was physically threatening and humiliating or was merely offensive, and whether it unreasonably interfered with the employee's work performance. *Harris*, 510 U.S. at 23; *Faragher v. Boca Raton*, 524 U.S. 775, 787–88 (1998). The conduct must be sufficiently extreme to constitute an alteration in the conditions of employment, so that Title VII does not evolve into a "general civility code." *Faragher*, 524 U.S. at 788. "Properly applied, this will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* at 787 (internal quotation marks omitted). Further, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 778.

A plaintiff must also demonstrate that the alleged events leading to the hostile work environment were connected, since "discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult." *Lester*, 290 F. Supp. 2d at 33 (citing *AMTRAK v. Morgan*, 536 U.S. 101,115–16 (2002)). For a hostile work environment claim to lie, "[w]orkplace conduct is not measured in isolation." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001).

For example, in *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005), the D.C. Circuit held that statements by three employees over a six-month period telling a plaintiff to "go back where she came from," separate acts of yelling and hostility, and allegations that the plaintiff was not given the type of work she deserved, were isolated instances that did not rise to the level of severity necessary to find a hostile work environment. *Id.* at 416–17. Similarly, in *Singh v. United States House of Representatives*, 300 F. Supp. 2d 48, 54–57 (D.D.C. 2004), this Court found that a plaintiff's allegations that her employer humiliated her at important meetings, screamed at her in one instance, told her to "shut up and sit down" in another instance, and was "constantly hostile and hypercritical" did not amount to a hostile work environment, even though these actions may have been disrespectful and unfair.

An employer can be shielded from liability on a claim of harassment if it establishes (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 724, 765 (1998); *see also Faragher*, 524 U.S. at 807; *Roebuck v. Washington*, 408 F.3d 790, 794–95 (D.C. Cir. 2005).

## III. ANALYSIS

Mr. Jones presents very limited evidence that could be construed to tie his treatment by Ms. Turbeville to his race; nothing at all supports his allegation of harassment/hostile work environment due to his gender. Due to the paucity of evidence, Mr. Jones cannot show that "but for" his race or his sex, he would have been better treated. Mr. Jones also alleges that "such hostile work environment . . . culminated in the discriminatory termination for an alleged misconduct." Third

Am. Compl. ¶ 69. GSK counters that it had a legitimate non-discriminatory reason for Mr. Jones's discharge, *i.e.*, his false reporting of two calls and lunch with a doctor. Mr. Jones fails to demonstrate pretext or to show that "but for" his race and/or gender, he would have retained his position. The Title VII allegations must be dismissed. The wrongful discharge claim must be dismissed as it is barred by the statute of limitations.

### A. Alleged Title VII Violations

1. Harassment/Hostile Work Environment

"[N]ot all abusive behavior, even when it is motivated by discriminatory animus, is actionable. Rather a workplace environment becomes hostile for the purposes of Title VII only when offensive conduct permeates [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002) (internal quotation marks omitted). "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discrimination* . . . because of [race and gender].'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (emphasis added); *Stewart*, 275 F.3d at 1133 (noting Title VII is not "a remedy for all instances of verbal or physical harassment, for it does not purge the workplace of vulgarity") (internal quotation marks omitted).

In his Opposition, Mr. Jones identifies Joanna Turbeville as the main culprit responsible for having harassed him because of his race and/or sex, although he points to actions by Susan Vasco as well.[9] *See* Opp'n 11–12. Each woman claimed in some way to be superior to him.

_____

[9] The Third Amended Complaint alleges "Plaintiff suffered in a [sic] severe and pervasive harassment by Turbeville and other co-workers, that Plaintiff was subjected to a continuous hostile environment including adverse employment actions, which altered the conditions and terms of his

Mr. Jones points to his relationship with Ms. Vasco, a co-worker who was not his superior, to demonstrate the harassment he experienced. *See* Jones. Dep. 270–83. Specifically, in a twenty-minute phone call in January or February 2005, Ms. Vasco "rant[ed] and rav[ed]" at Mr. Jones, acted belligerently on the phone, and ultimately stated that "she thought I was inferior." *Id*. at 283. On at least one occasion, and perhaps on the same phone call, Ms. Vasco also called Mr. Jones "incompetent." *See id*. at 274, 277. Ms. Vasco also called Human Resources to inform the office that Mr. Jones did not want to work with her anymore, which Mr. Jones claims was not true. *See id*. at 273. GSK acknowledges that Ms. Vasco may have "openly expressed her beliefs that [Mr. Jones] was incompetent and inferior." Def.'s Mem. 42.

Most of Mr. Jones's complaints about Ms. Turbeville's treatment of him focus on events that occurred during their five work contacts. *See, e.g.*, Jones Dep. 319–20. Mr. Jones felt, *inter alia*, that Ms. Turbeville was "contentious" during their work contacts and would "dismiss[] any feelings or ideas [he] contribute[d] without hearing them." Jones GSK Employee Issues File 1–2. On these visits, Ms. Turbeville mentioned her political affiliations as a way, Mr. Jones felt, to intimidate him and also stated that she was going to "whip [him] into shape." Jones Dep. 313. Further, Ms. Turbeville made "the statement that I'm not as good as her," which Mr. Jones found "demeaning and degrading." Jones Dep. 321. The March 13, 2006 work contact was particularly difficult and Mr. Jones noted that Ms. Turbeville described the failed doctor visit as "bizarre and

---

employment." Third Am. Compl. ¶ 68. "Evidence of such hostile work environment . . . culminated in the discriminatory termination for an alleged misconduct." *Id.* ¶ 69. Although the Complaint states that Mr. Jones suffered harassment by Ms. Turbeville and "other co-workers," *id*. ¶ 68, he makes no substantive mention of any other harassing co-worker besides Ms. Vasco, and admits that he does not recall being harassed by anyone other than Ms. Vasco and Ms. Turbeville. *See* Jones Dep. 308.

crazy," and then proceeded to demean and belittle Mr. Jones in front of others. Jones GSK Employee Issues File 2–3. Mr. Jones, however, does not recall that Ms. Vasco or Ms. Turbeville ever made any offensive comment specifically referring to his race or gender or made any derogatory statements about men, African-Americans or black men in general. *See* Jones Dep. 279–82, 321.

The Court concludes that a reasonable juror might find statements from white women accusing an African American man of being "inferior" to be code for race discrimination.[10] Nonetheless, the statements and interactions that Mr. Jones reports were not, as a matter of law, sufficiently pervasive to create a hostile work environment due to his race and/or gender. Ultimately, whether considered alone or cumulatively, the alleged acts complained of by Mr. Jones cannot meet the "demanding standards" for a hostile work environment claim. *Baird v. Snowbarger*, Civ. No. 09-1091, 2010 U.S. Dist. LEXIS 109091, *38 (D.D.C. Oct. 13, 2010); *see also Stewart*, 275 F.3d at 1134 (noting that "a few isolated incidents of offensive conduct do not amount to actionable harassment"). Courts must keep Title VII "from expanding into a general civility code." *Oncale*, 523 U.S. at 81. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Id.* (internal quotation marks omitted). To be actionable, the conduct must be pervasive and "extreme." *Faragher*, 524 U.S. at 788. The Court finds that a reasonable person would not find the alleged actions and statements by Ms. Vasco and Ms. Turbeville, viewed in their totality, to be so pervasive or extreme that they created an objectively

----

[10] These statements are denied and the Court makes no findings that they were said, that being the province of a jury. Rather, assuming that the statements were made, and as explained further, the Court finds them insufficient to sustain allegations of harassment/hostile work environment or race-based discharge.

hostile or abusive work environment.

It is very clear from the record that Mr. Jones experienced job-related tensions and personality conflicts and that his co-worker, Ms. Vasco, treated him shabbily.[11] Many of Mr. Jones's complaints about Ms. Turbeville arose from their differences in style. His was a kindly, friendly approach to customers in which he provided information and let the products sell themselves. Ms. Turbeville distinctly wanted a more aggressive approach: constant direct selling with "urgency" and with use of "clinicals." Ms. Turbeville insisted that Mr. Jones adopt an entirely different approach to selling. Mr. Jones's subjective belief that he was demeaned seems to have corresponded to the substance and manner in which Ms. Turbeville attempted to offer constructive criticism, as reflected in the various Field Coaching Tools. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir.

---

[11] Mr. Jones understood that GSK had a policy by which employees were supposed to report any discrimination or harassment they were subjected to or observed, yet he does not recall ever reporting Ms. Vasco's behavior to anyone. Jones Dep. 42, 302–04. Nevertheless, Ms. Turbeville became aware of Ms. Vasco's behavior. On June 15, 2005, Ms. Turbeville acknowledged that Ms. Vasco's treatment of fellow employees, including Mr. Jones, warranted correction and she issued a "Coaching Memo" to Ms. Vasco. *See* Turbeville Decl., [Ex. J] Letter to Susan Vasco. The memo noted that Ms. Vasco's interactions were "perceived to be confrontational" and that such behavior "is not acceptable and needs immediate resolution. Moving forward, it is important that a professional, respectful work environment be maintained at all times." *Id*.

Mr. Jones appears to acknowledge that Ms. Vasco's harassment ceased sometime in the first half of 2005. *See* Jones Dep. 276, 309–10. Therefore, Ms. Vasco's unprofessional treatment of Mr. Jones, which he attempts to impute to GSK, would likely fail since Ms. Turbeville took action to prevent this behavior. *See Lester*, 290 F. Supp. 2d at 22 (noting that a prima facie element of harassment is that the employer knew or should have known of the harassment and failed to act to prevent it). GSK could have an affirmative defense as to allegations involving Ms. Vasco as it appears to have exercised reasonable care to prevent harassment in its offices, through implementing an anti-harassment policy, and Mr. Jones unreasonably failed to take advantage of the corrective measures in place to remedy harassment, by failing to report Ms. Vasco's behavior. *See Taylor v. Solis*, 571 F.3d 1313, 1318 (D.C. Cir. 2009). However, even if the Court were to assume or find that Ms. Turbeville took no steps to ameliorate Ms. Vasco's behavior or that Mr. Jones complied with GSK's anti-harassment policy — both of which are highly questionable on this record — the Court would still find that Ms. Vasco's actions, in their totality, did not create a hostile work environment.

2008) (noting that a plaintiff's "allegations of insult are undercut by the legitimate reasons and constructive criticism offered in the letters of counseling and reprimand").  In essence, the conduct of which Mr. Jones complains relates to Ms. Turbeville's dissatisfaction with his job performance; personality conflicts between the two; and Mr. Jones's dislike of Ms. Turbeville's style or method of supervision, more than race or gender discrimination.

Additionally, while Mr. Jones has clearly demonstrated that he and his supervisor were dramatically at odds, he has not tied her demands or treatment of him to racial or gender hostility.  Even if the events complained of amalgamated to form a hostile work environment, Mr. Jones's claim would nonetheless fail because there is no evidence, besides Mr. Jones's subjective belief, that his treatment was due to his membership in one or more protected classes.  *See Na'Im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009) ("Courts in this jurisdiction have routinely held that hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class.") (*citing Baloch*, 550 F.3d at 1201).  There is a difference between a hostile work environment that constitutes actionable harassment under Title VII and one that is frustrating or unpleasant to an employee.  The record clearly illustrates the latter, but nothing of the former.

2.  Discharge

Mr. Jones's argument that a reasonable jury could find that he was discharged because of his race and/or sex is unpersuasive.[12]  He offers no evidence that would tie his race or sex to his

_____

[12]  Mr. Jones has conceded all counts, including his disparate treatment claims under Title VII and the D.C. Human Rights Act.  What remains are his claims of harassment/hostile work environment under Title VII and his claim of wrongful termination in violation of an implied

discharge rather than performance issues. He merely states, repeatedly, that the "downturn in Plaintiff's performance coincide[d] with the assignment of Joanna Turbeville as Plaintiff's supervisor." *See, e.g.*, Opp'n 6 ¶¶ 18, 28, 36, 47.

GSK contends that it fired Mr. Jones because he falsely reported two calls and falsely requested reimbursement for a restaurant lunch with a doctor that did not happen. GSK also points to Mr. Jones's failure to meet legitimate expectations as an employee. *See* Def.'s Mem. 22. Mr. Jones argues that Ms. Turbeville had no "direct evidence" that he violated GSK rules in any of these events and that Ms. Turbeville "criticized [Mr. Jones] for purchasing take out lunches for physicians who he met with after the visit, and leaving it for the doctor to eat at his convenience, when she could not say for certain that there is a rule specifically forbidding such behavior." Opp'n 8 ¶ 55, 13. The argument mis-perceives the law and the facts in the record.

An employer does not need "direct evidence" of employee wrong-doing to avoid Title VII liability arising from a discharge. As long as Ms. Turbeville honestly believed that Mr. Jones had engaged in submitting false reports, then GSK has met its burden to demonstrate a legitimate non-discriminatory reason for its actions. *See Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). It is up to Mr. Jones to show that GSK's proffered reason is pretextual and hides illegal discrimination. *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 492 (D.C. Cir. 2008); *Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002) (finding that summary judgment may be granted if a plaintiff's evidence of pretext is "merely colorable" or "not significantly probative");

---

contract of due process. *See supra* note 1. Harassment and termination are different events: for instance, one occurs *during* employment and the other *ends* employment. Yet Count 2 of the Third Amended Complaint, claiming harassment and hostile work environment, alleges that "[e]vidence of such hostile work environment . . . culminated in the discriminatory termination for an alleged misconduct." Third Am. Compl. ¶ 69.

*Sharpe v. Bair*, 580 F. Supp. 2d 123, 129 (D.D.C. 2008) (holding that to prove pretext, a plaintiff must articulate specific and "significantly probative" evidence that a defendant's provided reasons were false). In making this showing, a plaintiff can rely on the entire record of evidence.

To avoid summary judgment, an employee must proffer a genuine dispute of material fact. Mr. Jones argues that Ms. Turbeville criticized Mr. Jones for purchasing take-out lunches but this point is not germane. Ms. Turbeville's concern was that Mr. Jones submitted an expense voucher for lunch at Ruby Tuesday with Dr. Davidson on February 16, 2006, when admittedly, Mr. Jones did not have lunch with the doctor — at Ruby Tuesday or anywhere else that day. The restaurant receipt, which indicates that two people spent about forty-five minutes at the restaurant over lunch, undermines Mr. Jones's explanation that he took two take-out lunches to the doctor's office. Whether he sat in the restaurant and ate lunch with someone else or brought the take-out lunches to Dr. Davidson's office is not a material fact. What matters is that Mr. Jones reported Dr. Davidson as an "attendee" at lunch, but that report was not accurate. Ms. Turbeville believed Mr. Jones falsely claimed a reimbursement.

Mr. Jones admits that he incorrectly logged two "calls" in early March 2006. First, he logged a March 2, 2006 "call" with Dr. Oplinger; following review, Ms. Turbeville discovered that Mr. Jones did not meet with Dr. Oplinger that day. Mr. Jones explained that he met with a doctor whom he believed to be Dr. Oplinger, but does not know the name of the doctor he actually met. Second, Mr. Jones logged a March 13, 2006 "call" with Dr. Hamersley. Ms. Turbeville was with Mr. Jones on March 13, 2006, and knew he did not have a face-to-face meeting with Dr. Hamersley. GSK policy requires a "call" to include a face-to-face meeting with a doctor to promote GSK products. Ms. Turbeville ultimately concluded these two "calls" were intentionally

misrepresented.

Mr. Jones makes a faint effort to argue disparate treatment because a single other Caucasian employee made an error on her reports and was allowed to correct the error. GSK convincingly shows that the situation referenced by Mr. Jones was not similar, and the comparison fails.[13] The other employee referred to instances where her expense report was returned for lack of

---

[13] In his Opposition, Mr. Jones cites pages 43–45 of Sharon Goodwyn-Pines's deposition for the proposition that she failed to report a call accurately, yet was allowed to correct the mistake. Opp'n 7 ¶ 54. The excerpt of Ms. Goodwyn-Pines's deposition, cited by Mr. Jones, consists of:

> Q: Have you ever made any kind of mistake in the Passport system that you later corrected?
> A: Yes.
> Q: Do you know or can you recall when you made the mistake how much time passed before you made the correction?
> A: Times that if I made a mistake within my expense reporting system, it's usually approved by the manager. They send it back. At that time, they sent it back, and there was a little drop-down box that would say this report has not been approved because thus and such. You go back in there, you read it, you see what it is – maybe you left out a couple of receipts or something like that; maybe you didn't put everybody's name in. You correct it and send it back, and you get the approval.
> Q: Okay. Did that ever occur while Joanna Turbeville was your supervisor?
> A: I think I've had a couple of those.
> Q: And she sent the report back to you?
> A: Yes.
> Q: And asked you to correct it?
> A: Huh-uh.
> Q: Do you know if she called the physician's office to verify whether the expense was incurred?
> A: I have no idea. Nothing like that.
> Q: Did she ever inform you that she was following up or whether she was following up with any particular physician's office about those expense reports that she sent back to you?
> A: Not to my knowledge.

Opp'n, [Ex. D] Sharon Goodwyn-Pines Decl. 7/24/09 at 43–45.

information, such as the employee's failure to attach a corresponding receipt or failure to include the names of all parties involved in a lunch or event, which is different from submitting a receipt for lunch with a doctor that never took place.

Ultimately, there are no factual disputes that are relevant here. Mr. Jones admits that he reported both of the false "calls" and submitted the erroneous expense voucher. Whether these actions were the result of mere inadvertence by Mr. Jones is not dispositive; Ms. Turbeville believed that Mr. Jones had engaged in intentional misconduct, and therefore made the decision to terminate him. Mr. Jones can point to no evidence to suggest that her decision was a pretext for illegal discrimination. Having conceded that he committed the misconduct with which he was charged, and having failed to show any disparate treatment, Mr. Jones has failed to rebut GSK's legitimate non-discriminatory reason for his discharge — including making any showing that Ms. Turbeville did not honestly believe that Mr. Jones purposefully submitted false reports — and has utterly failed to connect his discharge in any way to his race and/or gender.

### B. Alleged Wrongful Discharge

Mr. Jones claims that he had "an implied contract of due process prior to the termination of [his] employment" through an "investigative process" to review alleged employee misconduct that was not followed and "an opportunity to grieve the allegations" which he was not afforded. Third Am. Compl. ¶¶ 73–75, 80. GSK contends that the claim is untimely and without merit.

The wrongful discharge claim was added to this lawsuit only when the Third Amended Complaint was filed on September 9, 2009. Mr. Jones was discharged on or about March 30, 2006. In the District of Columbia, the statute of limitations for a wrongful discharge claim is

three years.  *See Walker v. Pharm. Research and Mfrs. Of America*, 439 F. Supp. 2d 103, 108 (D.D.C. 2006) ("In the District of Columbia, a litigant complaining of wrongful discharge must bring an action within three years after the claim accrues.") (citing D.C. Code § 12-301(8)).  GSK argues this claim is untimely as it does not relate back to the original pleading.  *See* Def.'s Mem. 25–26. Mr. Jones makes no response to this argument in his Opposition and, therefore, it is deemed conceded.  *See* LCvR 7(b); *Hopkins v. Women's Div., General Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (citing *FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997)).  The wrongful discharge claim must be dismissed as barred by the statute of limitations.

## IV.  CONCLUSION

The Title VII claims advanced by Mr. Jones have no merit and his wrongful discharge claim is barred by the statute of limitations.  The Defendant's motion for summary judgment will be granted, and the case will be dismissed.  Accordingly, the Defendant's motion to treat its motion for summary judgment as conceded will be denied as moot.  A memorializing Order accompanies this Memorandum Opinion.


Date:   December 20, 2010                        _____/s/_____
                                                ROSEMARY M. COLLYER
                                                United States District Judge